Lauren Regan, OSB # 970878
Email: lregan@cldc.org
Marianne Dugan, OSB # 932563
Email: mdugan@cldc.org
CIVIL LIBERTIES DEFENSE CENTER
1711 Willamette Street Ste 301 # 359
Eugene, OR 97401
Telephone: 541-687-9180

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

CHLOE LONGWORTH and ANNA LARDNER,

Plaintiffs,

v.

DONALD J. TRUMP, President of the United States, in his official capacity; KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS), in her official capacity; and U.S. DEPARTMENT OF HOMELAND SECURITY,

Defendants.

No. 6:25-cv-2268-AA

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

ORAL ARGUMENT REQUESTED

Plaintiffs move under Federal Rule of Civil Procedure 65(b) for a temporary restraining order and preliminary injunction enjoining implementation of the recently-issued regulations restricting protest behavior at and near federal property.

## INTRODUCTION

As explained in detail in the declarations of Plaintiffs and a witness filed herewith, Plaintiffs, and others similarly situated, have for months been assembling and exercising their free speech rights outside the Eugene office of the Department of Homeland Security and Immigration and Customs Enforcement (ICE), which is within a one-block federal building located between 6th and 7th Avenues and Pearl and High Streets in Eugene ("Eugene ICE building"). The building is

surrounded by City of Eugene-owned public sidewalks, and contains a plaza area, both of which have been consistently used as traditional public fora.

As discussed in more detail herein, both Plaintiffs protest at the Eugene ICE building every Tuesday, and often multiple days a week; and have been subjected to arrest, detention, citation, and warnings of the same, due to their vocal lawful protests. By fall 2025, nationwide opposition to and protest against ICE kidnappings and actions resulted in regular protests at ICE buildings and detention centers. *See, e.g.,* https://bridgingdivides.princeton.edu/issue-brief-mapping-rise-immigration-related-demonstrations-early-2025. In response, the Trump regime fast-tracked new rules greatly expanding the prior regulations governing conduct on federal property and non-federal property, as discussed in detail *infra*. Those revisions were originally set to take effect in January 2026, but were expedited and instead hastily took effect on November 5, 2025.

Plaintiffs filed this action on behalf of themselves, and others similarly situated, to challenge recently issued unconstitutional federal regulations, and to stop Defendants' pattern and practice of violating First Amendment rights and attempting to chill Plaintiffs and others from lawfully protesting outside of the Eugene ICE building. Defendants and their agents have recently begun unlawfully threatening, detaining, arresting, and charging Plaintiffs and others similarly situated, in violation of the U.S. and Oregon constitutions and in retaliation against them for vocally protesting against Defendants' immigration policies and practices. Then, federal prosecutors correctly dismiss these charges because they are not constitutional – however, the dismissals evade criminal case judicial scrutiny. Defendants' conduct is part of an officially-condoned pattern of retaliating against people who protest the Trump administration's cruel and unpopular immigration policies and practices.

Plaintiffs seek declaratory and injunctive relief against Defendants. Defendants must be enjoined from detaining, arresting, and charging Plaintiffs and chilling the rights of others similarly

situated; and the newly issued regulations must be declared unconstitutional and enjoined.

## BACKGROUND

Plaintiffs reside in Eugene, Oregon, and are local community members and human rights activists who are strongly opposed to the current immigration policies and tactics. They regularly attend protests against ICE and deportations, and stand in solidarity with immigrant community members.

In Eugene, Oregon, the downtown federal building where ICE, IRS, the Veterans Administration and other federal agencies are housed, has long been a traditional location for assembly and protest. The building is surrounded on all four sides with public (City of Eugene) sidewalks, and contains a plaza area near the corner of Pearl Street and 7th Avenue, both of which have long functioned as quintessential traditional public fora. The protests at issue in this case are not inside the buildings, but take place outside, and primarily on the sidewalk areas similar to decades of prior community protests against government policies and action.

Congress enacted 40 U.S.C. § 1315 (available at https://www.law.cornell.edu/uscode/text/40/1315) to authorize the Secretary of Homeland Security to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government and the persons on the property." Violations are criminalized under 40 U.S.C. § 1315(c). The pre-existing regulations regarding federal property are codified at 41 C.F.R. § 102-74.365 *et seq*., available at https://www.ecfr.gov/current/title-41/subtitle-C/chapter-102/subchapter-C/part-102-74/subpart-C.

In January 2025, the federal government issued proposed new regulations pursuant to 40 U.S.C. 1315, regarding what it characterized as "Rioter Violence at Federal Buildings." 90 Fed. Reg. 4398 (available at https://www.federalregister.gov/documents/2025/01/15/2024-31206/protection-of-federal-property). See also announcement at https://www.dhs.gov/news/2025/11/05/dhs-

announces-advanced-charging-authority-address-rioter-violence-federal-buildings. The 2025 DHS rule expands coverage to conduct in "areas outside" federal sites to the "extent necessary to protect the property and persons on the property." They also expand the criminalization of activities that involve protected assembly and expression, *i.e*. "prohibited conduct -- unusual noise."

The rules were finalized in June 2025. 90 Fed. Reg. 24, 217 (June 9, 2025) (to be codified at 6 CFR pt. 139.5) (available at https://www.federalregister.gov/documents/2025/06/09/2025-10223/protection-of-federal-property). These new proposed regulations were scheduled to go into effect January 1, 2026. *Id.* However, on November 5, 2025, the federal government announced that the new regulations were "accelerated," and would actually go into effect that day (November 5, 2025). *Id*. The government announced in a press release: "6 C.F.R. Part 139, initially scheduled to take effect January 1, 2026, will instead go into effect November 5, 2025, to address a recent surge in security and public safety threats." https://www.dhs.gov/news/2025/11/05/dhs-announces-advanced-charging-authority-address-rioter-violence-federal-buildings. Similar to this administration's hyperbolic claims that cities like Portland are "war zones," no such surge actually existed in reality. *See, e.g.,* https://apnews.com/article/fact-check-trump-portland-oregon-protests-antifa-203826406efb7420911ae756b4331f60.

Despite the fact that the new regulations state that they are not intended to violate state and/or federal law, they do in fact violate Oregon and US constitutions, and are obviously intended to chill the peoples' First Amendment rights on traditional public forums. The new regulations not only permit federal agents to enforce federal regulations on federal property, but appear to give them the authority to enforce these regulations off federal property, including upon traditional public fora that are not federal property. Additionally, the new regulations are so vague and overbroad that they blatantly violate First Amendment rights and provide federal agents with unfettered and expansive discretion to target, detain, arrest and attempt to prosecute lawful protected conduct, while providing

no clear explanation of the conduct that is prohibited.

In Eugene, Oregon, a wide coalition of human rights activists opposed to the Trump regime immigration policies and roundups regularly show up each Tuesday at the federal building where the ICE offices are located. Many activists show up Monday through Friday. Activists, including Plaintiffs, engage in a variety of protected activities there, including but not limited to assembling on public property (public sidewalks, plazas, and other areas adjacent to the federal building); giving speeches and singing protest songs; informing immigrants of their rights and accompanying and tracking immigrants to their check-ins; monitoring ICE activities; educating the public about political issues; chanting; marching; and using a megaphone to voice their opinions about ICE and its tactics. See Decls. of Amado Horton, Lardner, and Longworth.

In Eugene, DHS has threatened, detained, and arrested activists engaged in lawful First Amendment activity on public sidewalks and adjacent grass, and has now begun using the new regulations to harass, retaliate and detain activists. DHS has been alleging disorderly conduct for "unusual noise," and arresting and charging people for "failure to comply" with unconstitutional orders to stop lawful activities, such as taking photographs, despite the fact that the conduct targeted is lawful assembly and speech activity, and does not violate other state or federal laws.

Prior to the new regulations, Eugene DHS had been misapplying the pre-existing regulations regarding federal property, for example citing protesters for "failure to preserve property" when they merely were standing on the grass directly next to the city sidewalk, without causing any damage to the grass. That pre-existing regulation provides:

> What is the policy concerning the preservation of property?
>
> All persons entering in or on Federal property are prohibited from --
>
> (a) Improperly disposing of rubbish on property;
>
> (b) Willfully destroying or damaging property;

(c) Stealing property;

(d) Creating any hazard on property to persons or things; or

(e) Throwing articles of any kind from or at a building or climbing upon statues, fountains or any part of the building.

41 C.F.R. § 102-74.380. Standing on the grass clearly does not fit within any of these categories.

As explained in her Declaration, on November 18, 2025, Plaintiff Chloe Longworth was detained, arrested, and then issued a citation, apparently pursuant to the new regulations, for "unusual noise." At the time she was on the city-owned public sidewalk exercising her First Amendment rights, including using a megaphone and stating her opinions regarding the lack of moral character exhibited by ICE agents. DHS detained and arrested her, placed her in a detention cell within the ICE building, and gave her a citation, violation number 9233374. Exhibit A. The copy of the citation provided to Ms. Longworth is very faint and several words are not legible, but it appears to be for "prohibited conduct -- unusual noise." DHS seized several items of Ms. Longworth's property. She was eventually released from custody, but her property was not returned.

On or about December 1, 2025, the Assistant U.S. Attorney's office in Eugene informed Ms. Longworth's lawyer that the citation was being dismissed. Regan Decl.

On November 25, 2025, a DHS employee at the Eugene ICE building threatened Plaintiff Anna Lardner with arrest for "unusual noise" under the new regulations – the "noise" being her First Amendment-protected speech, speaking to the public through a megaphone, from a public sidewalk. Lardner Decl. Plaintiff Longworth was also present at that time, participating in the protest, and observed this. Longworth Decl. Plaintiff Lardner was standing on the public sidewalk reading Timothy Snyder's book, "On Tyranny," to passing cars and pedestrians, using a megaphone. Lardner Decl.; Longworth Decl. The DHS employee approached Ms. Lardner and informed her that she was making "unusual noise" and could be cited for federal disorderly conduct under the new regulations. Ms. Lardner responded that she had a First Amendment right to read into a megaphone on a public

sidewalk. DHS responded that their new rules allow them to arrest and cite her anywhere, including the public sidewalk. She responded that the regulations did not permit them to violate her constitutional rights, and an attorney who was present as a National Lawyers Guild Legal Observer affirmed that statement, reminding DHS that their regulations do not allow them to contravene U.S. and Oregon constitutional rights within a traditional public forum. DHS retreated into the building without arresting Ms. Lardner. Soon thereafter, three Eugene Police Department officers arrived on the scene, telling Ms. Lardner they had been called by DHS because of the "noise." When a different lawyer directly asked the lead officer if he was threatening Ms. Lardner with arrest or believed she was committing a crime or had done so, he said no, that he just wanted people to be "aware" that there were other people trying to use the building. He stated that a DHS employee had told EPD that someone had reportedly been trying to get into the federal building to go to the Veterans' Affairs office but was unable to do so because of a megaphone in his face. The EPD officers then left.

This explanation made little sense, and, as explained in Plaintiffs' declarations, the megaphone had not been anywhere near the person who apparently complained to the DHS staff, and that person had actually gone into the building and was not blocked in any way.

Protests by Plaintiffs and others will continue at the Eugene ICE building, despite the fact that many are scared to do so for fear of random and unlawful DHS arrests. It is likely that Defendants will continue with their enforcement of the newly-enacted unconstitutional regulations – issuing warnings, as well as detaining, arresting, and charging Plaintiffs and other protesters outside of the Eugene ICE building; and will continue also to misapply the pre-existing regulations and statute to target speech they do not agree with.

The intent to chill the constitutional rights of Plaintiffs and others who want to protest ICE misconduct is abundantly clear from this administration's public statements and actions. Defendants have shown clear bias and retaliation in the way they have treated Plaintiffs and others similarly

situated, attempting to suppress viewpoints they do not like. For example, on September 25, 2025, President Trump issued a shocking presidential memorandum directing the National Joint Terrorism Task Force to investigate, prosecute, and disrupt individuals and groups that criticize law enforcement and border control policies and actions because such actions were "anti-American." https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence. U.S. Attorney Pam Bondi recently issued content-based unconstitutional orders to target people who advocate against current immigration policy, as well as other so-called "anti-American" opinions. https://www.kenklippenstein.com/p/leak-fbi-list-of-extremists-is-coming.

In addition to verbally targeting anyone who speaks out against the regime, DHS now conducts snatch and grabs at and around federal property against people of color as well as protesters, so that no one feels safe to lawfully protest in downtown Eugene on the public sidewalks that surround the ICE building -- which is likely the goal of this regime.

Plaintiffs are two of the more outspoken protesters at the ICE building, and appear to have been targeted by DHS because of their speech and because of their appearance of being leaders of the weekly protests.

Although Plaintiffs continue to show up and protest, Defendants' activities at the Eugene ICE building against Plaintiffs and others would deter a person of ordinary resolve from assembling and exercising their constitutional rights to protest outside the building. As a result of the conduct alleged herein Plaintiffs and others similarly situated are suffering irreparable injury, and will likely suffer recurring injuries like the ones Defendants already have inflicted on them.

## LEGAL STANDARD

A plaintiff seeking a temporary restraining order or preliminary injunction must establish four factors: (1) a likelihood of success on the merits, (2) likely irreparable harm in the absence of

preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. See *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is a party, courts consider the last two factors together, because the equities for the State consist of the public interest in a case such as this. See *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Ninth Circuit permits courts to balance the first and third factors, such that "serious questions going to the merits" in combination with a balance of hardships that tips sharply towards the plaintiff can satisfy those two factors, so long as the plaintiff also shows that there is a likelihood of irreparable injury. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

The Administrative Procedure Act (APA) requires this Court to hold unlawful and set aside any agency action, finding, or conclusion that is found to be arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law. 5 U.S.C. § 706(2)(A)-(D).

By issuing the new regulations, Defendants violated the APA in one or more of the following ways:

a. Issuing regulations that are arbitrary, capricious, an abuse of discretion, and/or not otherwise in accordance with law;

b. Issuing regulations that are contrary to constitutional right, power, privilege, or immunity;

c. Issuing regulations in excess of statutory jurisdiction, authority, or limitations, and/or short of statutory right.

**ARGUMENT**

Plaintiffs have standing to challenge the regulations. They are likely to succeed on the merits, and the likely harm in the absence of an injunction is irreparable. An injunction is in the public

interest, and the balance of harms favors an injunction.

## I. PLAINTIFFS HAVE STANDING

Standing exists when a plaintiff has "suffered an injury in fact -- a concrete and imminent harm to a legally protected interest . . . that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "A plaintiff threatened with future injury has standing to sue if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *In re Zappos.com, Inc*., 888 F.3d 1020, 1024 (9th Cir. 2018) (internal quotation marks omitted).

"[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement" for other parties in the litigation. *Rumsfeld v. Forum for Acad. and Inst. Rights, Inc*., 547 U.S. 47, 52 n.2 (2006) (citing *Bowsher* v. *Synar,* 478 U. S. 714, 721 (1986)). *See also Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (same, citing *Rumsfeld*); *Clinton v. City of New York*, 524 U.S. 417, 431 n.19 (1998); *U.S. Dept. of Labor v. Triplett*, 494 U.S. 715, 719 (1990); *Watt v. Energy Action Ed. Found.*, 454 U.S. 151, 160 (1981); *Arlington Heights v. Metro. Housing Dev't Corp.*, 429 U.S. 252, 264, and n. 9 (1977); *Buckley v. Valeo*, 424 U.S. 1, 12 (1976) (per curiam).

Both Plaintiffs have standing based on ongoing and impending injuries. As explained in Plaintiffs' declarations, they both come every Tuesday (sometimes more often) to the Eugene ICE building to protest. Plaintiff Longworth was arrested and cited under the new regulations (with charges later dropped) and was then subsequently threatened with arrest again; and Plaintiff Lardner was threatened with arrest, both for "unusual noise," for expressing their opinions in a traditional public forum.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR APA CLAIM

Under the APA, courts "hold unlawful and set aside agency action" that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

The challenged regulations clearly constitute reviewable final agency action under 5 U.S.C. § 704, because they represent the "consummation" of the agency's decision-making process and action, "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted).

The regulations are not in accordance with law under the APA. Defendants' actions violate the Constitution, as discussed *supra,* because the vague and overbroad language used allows DHS employees unfettered discretion to arrest, detain, and cite protesters for First Amendment "noise," and threaten others with such treatment, unlawfully chilling speech and expressive conduct. The public is left to guess when or how their conduct may transgress the new regulations.

**A. The Regulations Fail the Fifth Amendment Vagueness Test**

Regardless of whether a law targets speech specifically, a law is unconstitutionally vague, under the Fifth Amendment (or Fourteenth Amendment, when addressing a state or local law), if it "fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To avoid being unconstitutionally vague a law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). *See Musser v. Utah*, 333 U.S. 95, 97 (1948) ("Legislation may run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused.")

> The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but

> upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.

*NAACP v. Button*, 371 U.S. 415, 432-33 (1963).

The new regulations are so vague that they do not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." They therefore are unconstitutional.

### B. The Regulations Do Not Satisfy the First Amendment Overbreadth Test

Separate from the Fifth Amendment, under the First Amendment "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 1587 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)). The Constitution protects against overbroad laws which "chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). The overbreadth doctrine allows a person to challenge a statute "not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Okla.,* 413 U.S. 601, 612 (1973). A law is overbroad and "unconstitutional on its face if it prohibits a substantial amount of protected expression." *Ashcroft,* 535 U.S. at 244.

Here, the prohibition against "unusual noise" on or near federal buildings violates the overbreadth standard, because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep. Given the historic ongoing and traditional presence of vocal protests outside of the downtown federal building where ICE and other federal agency offices are located, to prohibit "unusual noise" has an overbroad sweep -- particularly when expanded to areas adjacent to federal property like public sidewalks and streets.

### C. The Regulations Are Not Reasonable Time, Place, And Manner Restrictions

Where a law restricts speech in a traditional public forum, such as a sidewalk or plaza, it can be challenged, even where the restriction is content neutral. The protections afforded by the First Amendment are nowhere stronger than in streets, plazas, and parks, all categorized for First Amendment purposes as traditional public fora. *Berger v. City of Seattle*, 569 F.3d 1029, 1035-36 (9th Cir. 2009); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S. Ct. 948 (1983); *Long Beach Area Peace Network v. City of Long Beach,* 522 F.3d 1010, 1021 (9th Cir. 2008). The government's ability to regulate speech in a traditional public forum is "sharply circumscribed." *Perry Educ. Ass'n*, 460 U.S. at 45; *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018).

Even if they are "reasonable" and "content-neutral," time, place, or manner restrictions are subject to an "intermediate level of scrutiny." *Jacobson v. U.S. Dep't of Homeland Sec.*, 882 F.3d 878, 882 (9th Cir. 2018) (quoting *Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of L.A.*, 764 F.3d 1044, 1049 (9th Cir. 2014)).

Intermediate scrutiny means the rule "must not burden substantially more speech than is necessary to further the government's legitimate interests"; and "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *McCullen v. Coakley,* 573 U.S. 464, 477 (2014) (internal quotations omitted).

Time, place, and manner restrictions are permitted in public fora only if they are narrowly tailored to serve a significant governmental interest, leave open ample alternative channels for communication of the information, and do not delegate overly broad licensing discretion to a government official. *Askins*, 899 F.3d at 1044 (citing *Long Beach Area Peace Network*, 574 F.3d at 1023-24). *See also Nunez v. City of San Diego,* 114 F.3d 935, 951 (1997); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065 (1984); *Forsyth County v. Nationalist*

*Movement*, 505 U.S. 123, 130, 112 S. Ct. 2395 (1992). "[A]n ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official . . . is an unconstitutional censorship or prior restraint." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S. Ct. 935 (1969) (quoting *Staub v. City of Baxley*, 355 U.S. 313, 322, 78 S. Ct. 277 (1958)).

On the issue of “significant government interest,” the burden is on the government. “The First Amendment demands that municipalities provide ‘tangible evidence’ that speech-restrictive regulations are ‘necessary’ to advance the proffered interest in public safety.” *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 863 (9th Cir. 2001).

The regulations at issue here fail the “time, place, and manner” test. They are not narrowly tailored to serve a significant governmental interest; they do not leave open ample alternative channels for communication of the information; and they delegate overly broad enforcement discretion to the DHS officials. Defendants cannot meet their burden of showing that the regulations satisfy these tests.

## III. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF

As discussed herein, in addition to issuing unconstitutional regulations, Defendants have taken actions that violate Plaintiffs’ First Amendment rights, by singling out Plaintiffs for arrest, detention, and citation, and threats of the same, under the pre-existing regulations.

When the government restricts speech in a traditional public forum, strict scrutiny dictates that restrictions are allowed only if they serve a compelling state interest and are narrowly tailored to meet the needs of that interest. “If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677, 118 S. Ct. 1633, 1641 (1998). Any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must

be narrowly tailored to serve a compelling government interest, and restrictions based on viewpoint are prohibited. *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 800, 105 S. Ct. 3439 (1985); *Carey v. Brown*, 447 U.S. 455, 463, 100 S. Ct. 2286 (1980).

Because Plaintiffs come to the ICE building every Tuesday to protest, and sometimes more frequently, a declaratory judgment and injunction are appropriate. In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought, under 28 U.S.C. § 2201. There is an actual and justiciable controversy within the jurisdiction of this court, inasmuch as the Defendants have adopted and continue to enforce federal regulations, policies, and directives that authorize detention, arrest, charging, and use of force, attacking and endangering Plaintiffs' First Amendment activities, and chilling others' speech and expressive conduct.

A judicial declaration will serve a useful purpose in clarifying the parties' legal relations, confirming the limits of federal authority under 40 U.S.C. § 1315, and preventing future unlawful use of force against Plaintiffs and similarly situated individuals.

Further, because the government seeks to chill the public's right to lawfully protest, a Court order affirming the people's rights to lawfully protest on traditional public forums such as public sidewalks and the plaza is necessary to protect the full breadth of First Amendment rights in this situation.

## IV. THE REGULATIONS THREATEN IRREPARABLE HARM

As explained *supra*, Defendants are using the new regulations to arrest, detain, and issue citations to outspoken protesters, fueling fear among people who would like to lawfully protest. Assistant U.S. Attorneys later dismiss the charges, leaving no opportunity to challenge the constitutionality of the regulations in the criminal context. Defendants are using the regulations to

threaten other outspoken protesters with such treatment. Such bully behavior is also likely to chill the First Amendment activities of other, less outspoken, critics of the current regime. *See Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013) (to establish a First Amendment claim, Plaintiffs must show that the government conduct "would chill a person of ordinary firmness from future First Amendment activity").

## V. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF ISSUING A TEMPORARY RESTRAINING ORDER

The balance of equities and the public interest weigh in favor of issuing a temporary restraining order. Those "factors merge" when the government is the party to be enjoined. *Nken*, 556 U.S. at 435.

The balance of the equities tips sharply in Plaintiffs' favor. Plaintiffs, armed only with their voices and a megaphone, have been arrested and threatened with arrest for simply speaking out against the government – while standing on a city-owned public sidewalk. The arrests and threats have been specifically premised upon the new regulations that were hastily implemented. The public in general is likely to be chilled by such government behavior, reducing their likelihood of expressing their opinions, and gutting quintessential democratic freedoms.

In contrast, the federal government faces no harm from an injunction. The federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). *See also League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (holding that although "[t]here is generally no public interest in the perpetuation of unlawful agency action," "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operation'").

## CONCLUSION

For the foregoing reasons, the Court should issue a temporary restraining order and

preliminary injunction.

DATED December 8, 2025.

*/s/ Lauren Regan*
Lauren Regan, OSB # 970878
Email: lregan@cldc.org
Marianne Dugan, OSB # 932563
Email: mdugan@cldc.org
CIVIL LIBERTIES DEFENSE CENTER
1711 Willamette Street Ste 301 # 359
Eugene, OR 97401
Telephone: 541-687-9180

Attorneys for Plaintiffs