BRETT A. SHUMATE
Assistant Attorney General
Civil Division
MICHAEL VELCHIK, DC #187249
Senior Counsel to the Assistant
Attorney General
Michael.Velchik@usdoj.gov
SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
SUZANNE MILES, CABN #242048
Assistant United States Attorney
Suzanne.Miles@usdoj.gov
1000 SW Third Ave., Suite 600
Portland, Oregon  97204-2936
Telephone:     (503) 727-1075
Attorneys for Defendants


THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| CHLOE LONGWORTH; ANNA LARDNER, | Case No.: 6:25-cv-02268-AA |
| Plaintiffs, | RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity; KRISTI NOEM, Secretary U.S. Department of Homeland Security ("DHS"), in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................ ii

INTRODUCTION ............................................................................................................1

BACKGROUND ..............................................................................................................3

    A.  Statutory Background .........................................................................................3

    B.  Regulatory Background .......................................................................................4

    C.  Factual Background .............................................................................................7

    D.  Procedural Background ........................................................................................9

LEGAL STANDARD .......................................................................................................9

ARGUMENT ..................................................................................................................10

    I.  PLAINTIFF'S ARE UNLIKELY TO SUCCEED ON THE MERITS .............................10

        A.  The Protection of Federal Property Regulation Is Not
            Unconstitutionally Vague .................................................................................10

        B.  The Regulation Is a Valid Time, Place, and Manner Restriction Consistent
            with the First Amendment .................................................................................17

        C.  The Regulation Is Not Contrary to Law Under the APA .......................................22

    II.  PLAINTIFFS CANNOT SHOW IRREPARABLE HARM OR THAT THE PUBLIC
        INTEREST OR BALANCE OF THE EQUITIES WEIGH IN THEIR FAVOR.........23

        A.  Irreparable Harm .............................................................................................23

        B.  Balance of the Equities and Public Interest .........................................................24

    III. ANY INJUNCTIVE RELIEF SHOULD BE TAILORED TO PLAINTIFFS .................25

CONCLUSION...............................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACLU of Nev. v. City of Las Vegas*,
  333 F.3d 1092 (9th Cir. 2003) ............................................................... 17

*Asmann v. Masters*,
  98 P.2d 419 (Kan. 1940) ......................................................................... 15

*Cal. Teachers Ass'n v. State Bd. of Educ.*,
  271 F.3d 1141 (9th Cir. 2001) ................................................................ 11

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ................................................................................ 25

*Chaplinsky v. State of New Hampshire*,
  315 U.S. 568 (1942) ................................................................................ 17

*Connally v. Gen. Const. Co.*,
  269 U.S. 385 (1926) ................................................................................ 16

*Cornelius v. NAACP Legal Def. & Educ Fund, Inc.*,
  473 U.S. 788 (1985) .................................................................................. 9

*Cox v. Louisiana*,
  379 U.S. 559 (1965) ................................................................................ 18

*Cuviello v. City of Vallejo*,
  944 F.3d 816 (9th Cir. 2019) .................................................................. 18

*Esteban v. Central Missouri State College*,
  415 F.2d 1077 (8th Cir. 1969) ................................................................ 11

*Fla. Carpenters Reg'l Council v. City of Miami Beach*,
  No. 09-22329-CIV, 2009 WL 10699575 (S.D. Fla. Dec. 4, 2009) ......... 21

*Grayned v. City of Rockford*
  408 U.S. 104 (1972) ................................................................. 11, 13, 19, 20

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995) ................................................................................ 15

*Hoye v. City of Oakland*,
  653 F.3d 835 (9th Cir. 2011) .................................................................. 21

*Johnson v. United States*,
  576 U.S. 591 (2015) ................................................................................ 10

*Kovacs v. Cooper*
  336 U.S. 77 (1949) ............................................................................ 12, 18

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ................................................................................ 18

*March v. Mills*,
  867 F.3d 46 (1st Cir. 2017) ..................................................................... 19

*Meinecke v. City of Seattle*,
  99 F.4th 514 (9th Cir. 2024) ..................................................................... 9

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ................................................................................ 17

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................................ 24

*O'Brien v. Welty,*
    818 F.3d 920 (9th Cir. 2016) ......................................................................... 10

*Panther v. Hames,*
    991 F.2d 576 (9th Cir. 1993) ......................................................................... 16

*Portland Feminist Women's Health Ctr. v. Advocs. for Life, Inc.,*
    859 F.2d 681 (9th Cir. 1988) ......................................................................... 19

*Rosebaum v. City & County of San Franscisco,*
    484 F.3d 1142 (9th Cir. 2007) ....................................................................... 20

*Saia v. New York,*
    334 U.S. 558 (1948) ........................................................................................ 12

*Starbucks Corp. v. McKinney,*
    602 U.S. 339 (2024) .......................................................................................... 9

*State v. Pucket,*
    422 P.3d 341 (Or. Ct. App. 2018) .................................................................. 19

*Tamir v. Virgin Atl. Airlines,*
    205 F. App'x 607 (9th Cir. 2006) ................................................................... 22

*TikTok Inc. v. Garland,*
    604 U.S. 56 (2025) ........................................................................................... 17

*Tinker v. Des Moines School Dist.,*
    393 U.S. 503 (1969) ........................................................................................ 20

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ........................................................................................ 25

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) ................................................................................... 17, 18

*Turner Broad. Sys., Inc. v. FCC,*
    520 U.S. 180 (1997) ........................................................................................ 18

*United States v. Agront*
    773 F.3d 192 (9th Cir. 2014) .............................................................. 13, 14, 15

*United States v. Cassiagnol,*
    420 F.2d 868 (4th Cir. 1970) ........................................................................... 4

*United States v. Evans,*
    581 F.3d 333 (6th Cir. 2009) ......................................................................... 23

*United States v. Lindsey,*
    595 F.2d 5 (9th Cir. 1979) ............................................................................. 22

*United States v. Szabo,*
    760 F.3d 997 (9th Cir. 2014) .............................................................. 13, 18, 19

*United States v. Thomas,*
    No. 13-3370M-001-PHX-LOA, 2013 WL 5783408 (D. Ariz. Oct. 28, 2013) ........................ 18

*United States v. Wasylyshyn,*
    979 F.3d 165 (2d Cir. 2020) ........................................................... 1, 14, 17, 18

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982) ........................................................................................ 11

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ........................................................................................ 21

iii

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ................................................................................................. 9, 21
*Yates v. United States*,
   574 U.S. 528 (2015) ................................................................................................. 15

**Statutes**

5 U.S.C. § 553(b)(4)(B) .............................................................................................. 7
40 U.S.C. § 1315 .................................................................................................. passim
40 U.S.C. § 1315(a) ........................................................................................... 1, 3, 22
40 U.S.C. § 1315(c)(1) ......................................................................................... 1, 3, 4
Or. St. § 30.932 ....................................................................................................... 15
Pub. L. 80-566 ............................................................................................................ 3
Pub. L. 107-296 .......................................................................................................... 3

**Rules**

Federal Rule of Civil Procedure 65(c) ....................................................................... 25

**Regulations**

6 C.F.R. § 139.15 ..................................................................................................... 16
6 C.F.R. § 139.35 .............................................................................................. 8, 11, 14
6 C.F.R. § 139.35(c) .............................................................................................. passim
6 C.F.R. §. 139.5 ......................................................................................................... 7
38 C.F.R. § 1.218(a)(5) ............................................................................................ 12
38 C.F.R. § 1.218(b)(11) ...................................................................................... 12, 13
41 C.F.R. § 102-74.390 (2015) ............................................................................... 1, 4
41 C.F.R. § 102-74.390(a) ...................................................................................... 6, 14
14 Fed. Reg. 2799 (May 27, 1949) ............................................................................. 3
90 Fed. Reg. 4398 (Jan. 15, 2025) .............................................................................. 5
90 Fed. Reg. 24217 (June 9, 2025) ........................................................................... 2, 7
90 Fed. Reg. 49247 (Nov. 5, 2025) .............................................................................. 7

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## INTRODUCTION

Federal statutes authorize the government to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government," 40 U.S.C. § 1315(a), as well as "areas outside the property to the extent necessary to protect the property and persons on the property." *Id.* § 1315(b)(1); *see also id.* § 1315(e) (providing additional authorities to enforce Federal, state, and local laws "outside Federal property"). Until recently, Federal regulations only prohibited "[a]ll persons entering in or on Federal property . . . from . . . exhibiting disorderly conduct, or exhibiting other conduct on property that—(a) Creates loud or unusual noise or a nuisance; (b) Unreasonably obstructs the usual use of" various areas, "(c) Otherwise impedes or disrupts the performance of official duties by Government employees," or "(d) Prevents the general public from obtaining the administrative services provided on the property in a timely manner." 41 C.F.R. § 102-74.390 (2015). Courts have long upheld this regulation against vagueness challenges. *See, e.g.*, *United States v. Wasylyshyn*, 979 F.3d 165, 176 (2d Cir. 2020). Plaintiffs do not allege that this predecessor regulation is unconstitutional in any way. This regulation was limited to conduct on property owned or leased by the General Services Administration (GSA), despite the fact that the Government has the statutory authority to regulate such conduct in areas outside Federal buildings to the extent necessary to protect property and persons on the property.

This statutory authority has since been transferred to the Secretary of Homeland Security, who is authorized to "prescribe regulations necessary for the protection and administration of property owned or occupied by the Federal Government and persons on the property." 40 U.S.C. § 1315(c)(1). In an effort to close this gap, promote consistency, and address new problems, the Secretary of Homeland Security issued new regulations establishing—among other things—a

1

regulatory offense for "[c]reating a loud or unusual noise, noxious odor, or other nuisance." Protection of Federal Property, 90 Fed. Reg. 24217 (June 9, 2025) (codified at 6 C.F.R. § 139.35(c)). This anti-noise ordinance is substantively coextensive with the predecessor GSA regulation, except that this also covers conduct outside Federal property to the extent necessary to protect the property and persons on the property.

Plaintiffs Chloe Longworth and Anna Lardner sue to enjoin this regulation to the extent that it prohibits "loud" and unusual noises outside Federal buildings, on the grounds that this provision violates the First Amendment right to speech, Fifth Amendment protection against vagueness, and the Administrative Procedure Act (APA) as contrary to law. ECF No. 1 ("Complaint"); ECF No. 8 ("Motion for TRO").

The Court should deny Plaintiffs' Motion for a Preliminary Injunction. Plaintiffs are unlikely to succeed on the merits. First, the regulation's restriction on "loud" or unusual noises is consonant with the preexisting GSA regulation, which prohibited the same conduct when committed on Federal property and which is plainly constitutional under the First and Fifth Amendments. It is also not vague or impermissibly overbroad because, read in context, the regulation refers to nuisances, which are separately defined by the regulation and well-defined at common law. Second, even to the extent that Plaintiffs engage in protected speech, the regulation is the type of content-neutral time, place, and manner restriction that has long been upheld by courts as consistent with the First Amendment. And as the attached exhibits show, Defendants enforced this regulation just this way: Plaintiffs were arrested for using bullhorns or megaphones to disrupt activities in Federal buildings. In each case, they were cited only after someone working in the building reported being unable to complete work functions or feeling unsafe as a result of Plaintiffs' conduct. Nor do they even allege that others making equally loud noises are not being

prosecuted because they are expressing different viewpoints.  It therefore comports with the First and Fifth Amendments.  Because the regulation comports with the requirements of the Constitution and Federal statutes, it is also not contrary to law in violation of the APA.  Nor Plaintiffs cannot show irreparable harm.  Finally, the public interest and balance of the equities weigh in favor of the Government: Federal employees must be able to conduct official business without interference from objectively unreasonable nuisances.  Recent events at the Federal Building in Eugene, Oregon, underscore the importance of protecting this Federal property.

## BACKGROUND

### A.    Statutory Background

The Constitution grants Congress the authority "to dispose of and make all needful Rules and Regulations respecting . . . Property belonging to the United States."  U.S. Const. art. IV, § 3, cl. 2.  Congress has long exercised this authority to protect federal buildings. *See, e.g.*, Pub. L. 80-566, 62 Stat. 281; 14 Fed. Reg. 2799 (May 27, 1949) (authorizing Federal Works Agency to appoint uniformed guards for this purpose).

In response to the terrorist attacks of September 11, 2001, Congress enacted the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (Nov. 25, 2002).  As relevant here, the statute transferred authority for law enforcement and related security functions for Federal properties from the General Services Administration (GSA) to DHS.  The act requires the Secretary to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property." 40 U.S.C. § 1315(a). This further authorized "[t]he Secretary, in consultation with the Administrator of General Services" to "prescribe regulations necessary for the protection and administration of property owned or occupied by the Federal Government and persons on the property."  *Id.* § 1315(c)(1).  Individuals who violate these

regulations "shall be fined under title 18, United States Code, imprisoned for not more than 30 days, or both." *Id.* § 1315(c)(2).

Significantly, this authority explicitly includes the ability to police the property and areas around Federal buildings. The Secretary may designate "officers and agents for duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property." *Id.* § 1315(b)(1). While engaged in such duties, these officers and agents are authorized to "conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property[.]" *Id.* § 1315(b)(2)(E); *see also id.* § 1315(e) (providing additional authorities to enforce Federal, state, and local laws "outside Federal property"). Courts have interpreted these authorities as conferring on federal agencies "not only the right, but also the duty, to see that government property under its charge and control is in proper condition for normal usage, so that government business may continue." *United States v. Cassiagnol*, 420 F.2d 868, 874 (4th Cir. 1970). "It is reasonable and constitutional to delegate to the agency charged with maintenance and protection of government property the right to fix the hours and places where the property may be entered by the public, as well as minimum acceptable conduct thereon, and to provide for the punishment of those violating such regulations." *Id.* at 876-77.

## B.    Regulatory Background

Previously, Federal regulations limited loud and unusual noises only on GSA property. Specifically, 41 C.F.R. § 102-74.390 (2015) provided:

> All persons entering in or on Federal property are prohibited from loitering, exhibiting disorderly conduct, or exhibiting other conduct on property that—

4

      (a) Creates loud or unusual noise or a nuisance;

      (b) Unreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots;

      (c) Otherwise impedes or disrupts the performance of official duties by Government employees; or

      (d) Prevents the general public from obtaining the administrative services provided on the property in a timely manner.

Plaintiffs do not allege that this prohibition on "loud or unusual noise" is unconstitutionally vague or violates the First Amendment.

On January 15, 2025, DHS issued a notice of proposed rulemaking for Protection of Federal Property, 90 Fed. Reg. 4398 (Jan. 15, 2025). This explained that "[o]ver the past decade, DHS has encountered a myriad of criminal misconduct directed at and occurring on federal property, including violent acts committed by active shooters, assaults and disturbances committed by competing and conflicting individuals or groups, and increased threats, harassment, and hazards perpetrated or presented by bad-faith actors." *Id.* at 4399. In fiscal year 2022, for example, the Federal Protective Service responded to 1,292 threats directed towards federal facilities and their occupants; conducted 58,084 protective security officer post inspections; stopped more than 189,462 weapons and prohibited items; made 505 arrests; and responded to over 17,000 incidents. *Id.* at 4400.

In this context, DHS noted that existing regulations are limited to "only when the conduct is committed on the property itself and not adjacent thereto." *Id.* at 4401. The regulations are therefore "not as comprehensive as contemplated by 40 U.S.C. 1315" and the "proposed rulemaking is meant to close these enforcement gaps." *Id.* These regulations are "[i]nformed by lessons learned from terrorist attacks and other criminal misconduct" and "intended to address the day-to-day criminal activity encountered by DHS on Federal property[.]" *Id.* Relevant here, the

goal is to "permit the charging of regulatory violations occurring near or adjacent to federal property." *Id.* This will allow DHS to "more effectively effectuate crowd management by citing and releasing criminal actors rather than requiring an arrest and detention, thus permitting officers to respond to more serious criminal activity and preserve limited detention resources." *Id.* Further, such "regulatory charges serve to fill the void where there is no applicable federal statutory charge applicable to the conduct and no MOU permitting DHS to charge state or local offenses." *Id.* These "serve as a lower-level charging option for subjects whose criminal conduct is less significant and does not warrant higher level charges under Title 18." *Id.* Finally, the "proposed revisions would also promote equity by allowing the same charging options for individuals committing the same conduct regardless of whether they are standing on or merely adjacent to the property." *Id.*

With respect to regulations concerning noise, the notice explains that "Section 139.35(c) would prohibit creating loud or unusual noises, noxious odors, or other nuisances that affect the safety of persons on Federal property, or otherwise disrupts Government functions on the property." *Id.* at 4408. This "would be functionally identical and textually similar to the existing provision in 41 CFR 102-74.390(a)" with the one difference being the inclusion of "a prohibition of noxious odors as a specific type of prohibited nuisance." *Id.* at 4408. This was included in response to "stink-bombs" and "other odor-emitting devices in such a manner as to adversely impact Federal property and its occupants." *Id.* at 4408. The regulation further noted that "[t]he existing prohibition against loud or unusual noises remains necessary to ensure persons, particularly through use of bullhorns, megaphones, or other audio equipment, do not disturb or otherwise interfere with the performance of official Government functions, particularly the provision of services to the general public." *Id.* at 4408.

6

On June 9, 2025, DHS published the final rule, intending for the new regulations to go into effect on January 1, 2026. 90 Fed. Reg. 24217 (June 9, 2025) (codified at 6 C.F.R. §. 139.5). The final rule again explained that existing regulations were "not as comprehensive and do not fully conform to the Secretary's authority under 40 U.S.C. 1315 to protect Federal property falling within DHS's jurisdiction," but the new "rule closes these enforcement gaps." *Id.* at 24217. The challenged provision, to be codified at § 139.35, provided that "All persons are prohibited from engaging in the following conduct, on Federal property or in areas outside Federal property, that affects, threatens, or endangers Federal property or persons on Federal property[,]" including "[c]reating a loud or unusual noise, noxious odor, or other nuisance." *Id.* at 24220. The regulation also separately defined "nuisance" to mean "a condition, activity, or situation, to include a loud noise or foul odor, that interferes with the use or enjoyment of Federal property." *Id.* at 24219. "No substantive comments were received during the 60-day public comment period." *Id.* at 24217.

On November 5, 2025, DHS changed the effective date from January 1, 2026, to November 5, 2025. 90 Fed. Reg. 49247 (Nov. 5, 2025). DHS established "good cause" for this change in the rule's implementation, citing to then-recent "substantial rise in civil unrest near federal buildings, destruction of federal property, and violence perpetrated against federal officials." *Id.*; *see also* 5 U.S.C. § 553(b)(4)(B).

## C.    Factual Background

Plaintiffs Chloe Longworth and Anna Lardner have engaged in protest activities on the sidewalks around the Federal Building in Eugene, Oregon, that houses ICE, IRS, the VA, and other Federal agencies. ECF 1 ("Complaint") at ¶ 15, ¶¶ 28–31. They have been cited for violating the newly-enacted federal noise ordinance, 6 C.F.R. § 139.35(c), which prohibits "[c]reating a loud or

unusual noise, noxious odor, or other nuisance" "on Federal property or in areas outside Federal property, that affects, threatens, or endangers Federal property or persons on the Federal property."

On November 18, 2025, Plaintiff Longworth was among a group of protestors demonstrating outside of the Eugene Federal Building. ECF 1 at ¶ 7; Exh. A at 2. According to an employee inside the building, the protestors were using a megaphone to amplify their voices and using vulgarities like "FUCKING NAZIS", "RAPISTS", and "PEDOPHILES." Exh. A at 4. Because of the language being used and the volume to which it was amplified, the employee did not feel safe going outside of the building to perform his work duties. *Id.*

A Federal Protective Services (FPS) officer arrested Plaintiff Longworth and issued a citation for violating 6 C.F.R. § 139.35's noise ordinance. *Id.* at 5. At the time of her arrest, Plaintiff Longworth was carrying two megaphones. Exh. B.

On November 25, 2025, Plaintiff Lardner was at the Eugene Federal Building engaged in protest activity using a megaphone. ECF 1 at ¶ 30. At about 12:30 p.m., an IRS employee working inside of the building complained that the noise from the demonstration was interfering with the agency's routine business operations. Exh. C at 4. FPS officers issued warnings about the noise, but, after those verbal warnings, the noise intensified. *Id.* At about 1:45 p.m., Eugene Police officers arrived on scene in response to noise complaints made by employees and others in the immediate area. *Id.* at 5. Close to 3 p.m., other IRS employees complained to FPS about the noise, saying that it was interfering with their ability to interview customers, a critical part of their tax review duties. *Id.* at 5–6. Although warnings were issued to the protestors, including Plaintiff Lardner, no arrests were made or citations issued. *Id.*; ECF 1 at 30.

An FPS officer noted that Plaintiff Lardner returned to the building the following week to participate in a regularly scheduled weekly protest. She engaged in protest activity for about four hours that day and left without incident. Exh. C. at 6.

**D.    Procedural Background**

On December 5, 2025, Plaintiffs filed a Complaint alleging that Defendants' enforcement of 6 C.F.R. § 139.35(c)'s noise ordinance violates the APA, First Amendment's free speech protection, and Fifth Amendment's guarantee against vagueness. ECF No. 1. On December 9, 2025, Plaintiffs moved for a temporary restraining order seeking to enjoin Defendants from enforcing the noise ordinance on the sidewalks around the federal building located between 6th and 7th Avenues and Pearl and High Streets in Eugene, Oregon. ECF No. 8. On December 10, 2025, this Court granted a temporary restraining order. ECF No. 14.

## LEGAL STANDARD

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008)). To warrant such relief, a plaintiff must "make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Id.* at 346 (quoting *Winter*, 555 U.S. at 20). In assessing likelihood on the merits of a First Amendment claim, the Court must: (1) "decide whether the relevant speech is protected"; (2) "identify the nature of the forum"; and (3) assess whether the restriction satisfies the requisite standard. *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (quoting *Cornelius v. NAACP Legal Def. & Educ Fund, Inc.*, 473 U.S. 788, 797 (1985)).

9

**ARGUMENT**

Plaintiffs allege that DHS's Protection of Federal Property regulation is unconstitutionally vague under the Fifth Amendment, violates their First Amendment right to speech, and, to that extent, also violates the APA as contrary to law. But Plaintiffs are unlikely to succeed on their vagueness challenge, because the noise ordinance tracks well-defined regulatory and common-law nuisances. They are also unlikely to prevail on the First Amendment claim, because the regulation is a content-neutral time, place, and manner restriction. Relatedly, because the regulation is consistent with the First and Fifth Amendments, Plaintiffs' APA claim, that the regulation is contrary to law, lacks merit. Nor can Plaintiffs show irreparable harm. Finally, the public interest and balance of the equities weigh against issuing an injunction, because the government's interest in carrying out normal operations of government outweigh any right to engage in objectively-unreasonable disturbances.

## I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A.    The Protection of Federal Property Regulation Is Not Unconstitutionally Vague

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Supreme Court has held that "the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Vague laws that reach speech implicate three main concerns: "(1) individuals should not be punished for behavior they could not have known was illegal[,] (2) vague laws allow arbitrary and discriminatory enforcement[,] and (3) vague laws may have a chilling effect on free speech." *O'Brien v. Welty*, 818 F.3d 920, 930 (9th Cir. 2016). "[P]erfect clarity is not required

10

even when a law regulates protected speech." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001). As relevant here, "[t]he degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment" and, for example, may be less stringent in cases of regulations. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982).

Here, Plaintiffs allege that the Protecting Federal Property regulation is unconstitutionally vague because it does not define "loud" or "unusual" noise. ECF No. 8 at 12. But even taking these terms in isolation, Plaintiffs' argument is foreclosed by Supreme Court precedent. In *Grayned v. City of Rockford*, the Supreme Court rejected a vagueness challenge to an anti-noise ordinance prohibiting the "making of any noise or diversion" near school grounds. 408 U.S. 104, 107-08 (1972) (quoting ordinance). "Noise" and "diversion" were not defined. *See id.* at 110-11. Rather than finding them condemnably vague, the Court found them "marked by flexibility and reasonable breadth[.]" *Id.* (quoting *Esteban v. Central Missouri State College*, 415 F.2d 1077, 1088 (8th Cir. 1969)). Because the rule specified its goal—preventing noise "which disturbs . . . the peace or good order of" school sessions or classes—the "prohibited disturbances are easily measured by their impact on the normal activities of the school." *Id.* at 112. As such, the ordinance clearly "delineates its reach in words of common understanding." *Id.*

The same is true here. This regulation prohibits making noise that is loud or unusual enough that it "affects, threatens, or endangers Federal property or persons on the Federal property." 6 C.F.R. § 139.35. Speaking into a megaphone on the sidewalk outside of an operating Federal building during work hours is the type of activity that a person of ordinary intelligence would understand is likely to affect the persons working inside. Although sound amplifiers are

11

"indispensable instruments of effective public speech[,]" they "can be controlled by narrowly drawn statutes." *Saia v. New York*, 334 U.S. 558, 562 (1948).

Thus, in *Kovacs v. Cooper*, the Supreme Court upheld a city ordinance prohibiting the use of a "loud speaker or sound amplifier" that emits "loud and raucous noises," even within public fora. 336 U.S. 77, 78 (1949). The plaintiff alleged that this ordinance was so vague as to violate due process, and Court squarely acknowledged that the regulation "affect[ed] liberty of speech[.]" *Id.* at 79. Nonetheless, the Court treated the claim as borderline frivolous. *See id.* ("The contention that the section is so vague, obscure and indefinite as to be unenforceable merits only a passing reference."). It explained that it would be "an extravagant extension of due process to say that" the government "cannot forbid talking on the streets through a loud speaker in a loud and raucous tone[,]" *id.* at 87, not least because the terms "loud" and "raucous" "have through daily use acquired a content that conveys to any interested person a sufficiently accurate concept of what is forbidden." *Id.* at 79. The same logic applies to DHS's regulation here.[1]

The Ninth Circuit has already applied this reasoning to anti-noise regulations for other agencies. The Department of Veteran Affairs (VA) prohibits "[c]onduct on property which creates loud or unusual noise … which otherwise impedes or disrupts the performance of official duties by Government employees." 38 C.F.R. § 1.218(a)(5). It also prohibits "[d]isorderly conduct which creates loud, boisterous, and unusual noise, or which obstructs the normal use of entrances, exits, foyers, offices, corridors, elevators, and stairways or which tends to impede or prevent the normal operation of a service or operation of the facility." 38 C.F.R. § 1.218(b)(11). In *United States v.*

---

[1] In addition to the megaphone usages, Plaintiff Longworth cites to an incident in which she was yelling and an officer said, "You need to stop yelling, Chloe—I don't want to have to come up there and arrest you again." Longworth Decl. ¶ 9. She was "with a small crowd of people, and [she] was the only one who was told to stop yelling." *Id.* No citation issued after that warning.

*Agront*, the Ninth Circuit held that these regulations were not unconstitutionally vague as to a defendant who "yell[ed] … in the parking lot loudly enough to be heard in the hospital lobby 25 yards away," prompting staff to "le[a]ve" their work "to monitor the situation in the parking lot[,]" and "continued to yell loudly" as he was being arrested. 773 F.3d 192, 194 (9th Cir. 2014). The court interpreted the applicable regulations as "includ[ing] a requirement that the 'disorderly conduct which creates loud, boisterous, and unusual noise' also be conduct that would tend to disturb the normal operation of a VA facility." *Id.* at 196 (quoting 38 C.F.R. § 1.218(b)(11)). The court then concluded that "the regulation, so interpreted, is not unconstitutionally vague as applied to [defendant's] conduct." *Id.*

In reaching this conclusion, the court applied the reasoning in *Grayned* to the context of VA facilities. *See id.* at 196-98. The opinion emphasized that the regulation was "designed, as a whole, to maintain a calm environment at VA facilities" and served "[t]he government's interest in caring for veteran patients and not triggering adverse psychological reactions[.]" *Id.* at 197 (quoting *United States v. Szabo*, 760 F.3d 997, 1003 (9th Cir. 2014)). "Most importantly," the court emphasized that *Grayned* held that "'[a]lthough the prohibited quantum of disturbance is not specified in the ordinance,' its purpose of protecting schools made it apparent 'that the measure is whether normal school activity has been or is about to be disrupted." *Id.* (quoting *Grayned*, 408 U.S. at 112). "So too here[,]" the "regulation does not explicitly define a necessary quantum of 'loud, boisterous, and unusual noise'" but this can be "found by looking to the context in which the regulation applies[.]" *Id.* In this case, "the quantum of … noise that is required to violate the regulation is conduct sufficiently 'loud, boisterous, and unusual' that it would tend to disturb the normal operation of a VA facility." *Id.* "Because th[is] controlling standard of conduct is reasonably

clear and [the defendant] clearly violated that standard," the court held that the "regulation [wa]s not unconstitutionally vague[.]" *Id.* at 199.

The Second Circuit came to the same conclusion when interpreting GSA's predecessor regulation that was limited to conduct that occurred on GSA property. Recall that regulation prohibited creating a "loud or unusual noise or a nuisance" on Federal property. 41 C.F.R. § 102-74.390(a). The Second Circuit rejected the argument that this was unconstitutionally vague. *United States v. Wasylyshyn*, 979 F.3d 165, 176 (2d Cir. 2020). It explained that "enforcement of the Noise Regulation is restricted to a narrow and special environment" and "[r]easonable people can predict with a high degree of accuracy whether their conduct would create a 'loud or unusual noise or a nuisance.'" *Id.* As a result, it was not unconstitutionally vague. *Id.* Nor did the regulation present any risk of "arbitrary and discriminatory enforcement[,]" because the plaintiff's conduct in that case—"shouting" at officers in the lobby of a Federal courthouse event after being "directed . . . to calm down"—fell "within the core of the Noise Regulation's prohibition[.]" *Id.* It was therefore constitutional.

Here, DHS's regulation also prohibits "[c]reating a loud or unusual noise." 6 C.F.R. § 139.35(c). Applying the logic of *Agront*, this prohibition should be read together with the rest of the regulation as limited to conduct "on Federal property or in areas outside Federal property, that affects, threatens, or endangers Federal property or persons on the Federal property." *Id.* Just as context made clear that the ordinance in *Grayned* was aimed at protecting the continued operations of schools, and the regulation in *Agront* in protecting continued operations at VA facilities, so here the context of the regulation clarifies its purpose is to promote the continued operations of government work on Federal buildings. Even if no quantum of noise is specified, it may be interpreted as prohibiting such "loud or unusual noise" as "would tend to disturb the normal

14

operation of the" facility.  *Agront*, 773 F.3d at 199.  In this case, the attached incident reports indicate that the standard was applied here: in both cases, individuals working inside the building reported being unable to work or feeling unsafe to continue working. Exh. A; Exh. C. "Because th[is] controlling standard of conduct is reasonably clear and [the defendants] clearly violated that standard," *Agront*, 773 F.3d at 199, the regulation is not unconstitutionally vague.

But this is in fact a much easier case than *Grayned*, *Kovacs*, *Agront*, or *Wasylyshyn*.  Here, the regulation does not simply use the terms "loud" and "unusual" in isolation.  Rather, the conduct at issue is defined by relation to a well-defined concept at common law and one also separately defined in the regulation.  The regulation by its text prohibits "[c]reating a loud or unusual noise, noxious odor, *or other nuisance*."  6 C.F.R. § 139.35(c) (emphasis supplied).  "The words immediately surrounding" this phrase "cabin the contextual meaning of that term." *Yates v. United States*, 574 U.S. 528, 543 (2015).  Courts refer to this canon as "the principle of *noscitur a sociis*— a word is known by the company it keeps" and employ this to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words[.]" *Id.* (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)).  Here, the regulation refers to "loud or unusual noise" as a "nuisance." § 139.35(c).  That phrase limits any potential breadth of the phrase.

The term "nuisance" is well-defined at common law and has even been codified by many State legislatures, including Oregon's.  *See* Black's Law Dictionary, ed. 11 ("nuisance" is "A condition, activity or situation (such as a loud noise or foul odor) that interferes with the use or enjoyment of property"); *see also, e.g.*, Or. St. § 30.932 (defining "nuisance" as "includ[ing] but is not limited to actions or claims based on noise . . ."); *Asmann v. Masters*, 98 P.2d 419, 423 (Kan. 1940) ("singing through a megaphone" constituted nuisance).  As the Supreme Court has recognized, courts have "uph[e]l[d] statutes as sufficiently certain" where they have "employed

15

words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them, . . . or a well-settled common-law meaning, notwithstanding an element of degree in the definition as to which estimates might differ[.]" *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926). "When a term has a well-settled common law meaning, it will not violate due process[.]" *Panther v. Hames*, 991 F.2d 576, 578 (9th Cir. 1993). Thus, as a matter of first principles, the regulation cannot be unconstitutionally vague because it is tied to the definition of "nuisance," which is well-defined at common law.

More particularly, this regulation explicitly defines "nuisance," consistent with the accepted legal meaning, as "a condition, activity, or situation, to include a loud noise or foul odor, that interferes with the use or enjoyment of federal property." 6 C.F.R. § 139.15. Thus, even if there were any doubt as to the contours of this common-law term, the regulation itself provides sufficient clarity to ensure the term is well-defined. Further, the definition itself limits the scope of the regulation to nuisances that "interfer[e] with the use of enjoyment of federal property," *id.*, which is still more definite.

Finally, the record before the Court indicates that this term has been applied in an objectively reasonable way consistent with its ordinary meaning. Significantly, both incident reports show that Plaintiffs were using megaphones, which by design is meant to emit a "loud" or "unusual noise." *See* Exh. A; Exh. C. One plaintiff was even arrested carrying two megaphones in her hands. Exh. B. Further, both incident reports show that Plaintiffs were only addressed after someone working inside the building complained that the noise was so loud and unusual that they could not carry out government business or felt unsafe. *See* Exh. A; Exh. C. This conduct certainly "falls within the core" of the regulation and is objectively "louder" and more "unusual" than the

conduct at issue in *Wasylyshyn*, which was limited to yelling without the aid of an amplifying device. 979 F.3d at 176.  Thus, both as written and as enforced, the regulation is not vague.

### B.    The Regulation Is a Valid Time, Place, and Manner Restriction Consistent with the First Amendment

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech."  U.S. Const. amend. I.  To the extent that individuals outside Federal buildings threaten violence against government employees or espouse "fighting words[,]" *i.e.*, "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace[,]" such conduct is not protected by the First Amendment.  *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572 (1942). *Cf.* Exh. A at 4 (reporting that Federal employee "did not feel safe to go outside to complete his janitorial duties for the building" and "asked for an escort").  To the extent that Plaintiffs are engaging in political speech, such verbalized protests outside of the federal building are protected under the First Amendment.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964).  There is also no dispute that the sidewalk around the Federal Building is a traditional public forum.  *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1099 (9th Cir. 2003) ("The quintessential traditional public forums are sidewalks, streets, and parks.").  The issue in dispute is whether the noise regulation is a proper content-neutral time, place, and manner restriction.  It is.

The regulation, by its plain terms, is content-neutral.  It regulates volume of speech, not content.  Content-neutral restrictions "are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."  *TikTok Inc. v. Garland*, 604 U.S. 56, 70 (2025) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994)).  Under that standard, the law is sustained "if it advances important governmental interests unrelated to the suppression of free speech and does not burden

substantially more speech than necessary to further those interests." *Id.* (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)).

Noise restrictions of this sort are commonly recognized as advancing an important government interest in protecting citizens from unwelcome noise to protect health, safety, and welfare. *See, e.g.*, *Kovacs*, 336 U.S. at 81 ("The avowed and obvious purpose of these ordinances is to prohibit or minimize such sounds on or near the streets since some citizens find the noise objectionable and to some degree an interference with the business or social activities in which they are engaged or the quiet that they would like to enjoy."); *Cuviello v. City of Vallejo*, 944 F.3d 816, 825 (9th Cir. 2019) ("there are good reasons for regulating sound-amplifying devices[,]" including "these devices can produce noise that is unpleasant and, certainly, unrestrained use … would be intolerable") (quotation omitted). The government also has an interest in maintaining the "fair and orderly working" of the employees within Federal buildings. *See Cox v. Louisiana*, 379 U.S. 559, 565 (1965) (permitting noise restriction in public forum around courthouse to reduced disruption to proceedings); *Szabo*, 760 F.3d at 1002 (recognizing government's interest in "prohibiting conduct that diverts attention and resources" of Federal employees). Other courts have therefore upheld regulations prohibiting "loud" or "unusual" noises in Federal buildings. *See, e.g.*, *Wasylyshyn*, 979 F.3d at 175 (upholding conviction for violating regulation prohibiting creating a "loud or unusual noise or nuisance" in Federal courthouse); *United States v. Thomas*, No. 13-3370M-001-PHX-LOA, 2013 WL 5783408, at *3 (D. Ariz. Oct. 28, 2013) (upholding regulation prohibiting "disorderly conduct" including "creat[ing] loud or unusual noise" within Veteran Affairs building). The logic of these decisions applies equally here.

Significantly, the government's interest is the same regardless of whether noise emanates from within or without the building. *See, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753,

772 (1994) (upholding injunction prohibiting "singing, chanting, whistling, shouting, yelling, use of bullhorns, auto horns, sound amplification equipment or other sounds … within earshot of" those in building during business hours); *Grayned*, 408 U.S. at 113 (upholding ordinance prohibiting noise outside that is "incompatible with normal activity" and causes "disruption"); *Portland Feminist Women's Health Ctr. v. Advocs. for Life, Inc.*, 859 F.2d 681, 686 (9th Cir. 1988) (upholding injunction against "shouting, screaming, chanting, yelling, or producing noise by any other means, in a volume that substantially interferes with … services within" building); *March v. Mills*, 867 F.3d 46, 49 (1st Cir. 2017) (upholding statute prohibiting making noise that "can be heard within a building" with intent to "interfere with … services within the building"). If a Federal employee is disturbed from work because of a loud or unusual noise, it makes no difference where the source is located. All else equal, loud noises made inside the building may reach more offices than a loud noise outside; but if the noise outside is sufficiently loud, it may well exceed in decibel levels any noise made within the meaning. *See, e.g.*, *Portland Feminist Women's Health Ctr.*, 859 F.2d at 686 (shouting outside building was "audible on the second floor"). Here, DHS found that loud and unusual noises originating from outside the building undermined the ability of Federal workers to conduct government business.

Against this backdrop, courts have regularly upheld similar anti-noise regulations under the First Amendment. To add a few more examples: the Ninth Circuit upheld the VA's anti-noise regulation in *Szabo*, where the defendant repeatedly yelled loud and rude phrases at federal employees, "[h]is yelling was so loud that it … was audible on other floors," and federal employees "feared for [their] safety[.]" 760 F.3d at 1000. An Oregon appellate court upheld a state law prohibiting "unreasonable noise" where defendant used a "bullhorn" on the "sidewalk." *State v. Pucket*, 422 P.3d 341, 344 (Or. Ct. App. 2018).

19

In *Grayned*, the Supreme Court explained that "[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." 408 U.S. at 116. Thus, "we think it clear that … expressive activity may be prohibited [on public sidewalk adjacent to school grounds] if it 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" *Id.* at 118 (quoting *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 513 (1969)). In particular, "schools could hardly tolerate boisterous demonstrators who drown out classroom conversation, make studying impossible, block entrances, or incite children to leave the schoolhouse." *Id.* at 119. The Court therefore upheld the anti-noise ordinance because it was appropriately "tailored to further [the government's] compelling interest in having undisrupted school session conducive to the students' learning, and does not unnecessarily interfere with First Amendment rights." *Id.*

The same analysis applies here. DHS's regulation at issue here only limits loud and unusual noises to the extent that it constitutes a nuisance and interferes with the functions of Government inside Federal buildings. As the attached exhibits illustrate, Defendants have invoked this authority where Plaintiffs were using bullhorns or megaphones that interfered with the work of those in the building. It therefore falls squarely within the contours of *Grayned* and other precedents.

A law that is neutral on its face may, nonetheless, be constitutionally infirm if its enforcement discriminates based on viewpoint. *Rosebaum v. City & County of San Franscisco*, 484 F.3d 1142, 1158 (9th Cir. 2007). "Content discrimination occurs when the government choos[es] the subjects that may be discussed, while viewpoint discrimination occurs when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject." *Id.* (quote omitted). The Ninth Circuit generally treats such claims as "selective

20

enforcement" claims under the Equal Protection Clause. *Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011). Regardless of how it is labeled, a plaintiff must show that the government's discriminatory enforcement "is the result of an intentional policy or practice." *Id.* Plaintiffs may prove the existence of an unwritten policy "by extrapolating from a series of enforcement actions … [which] demonstrate that the municipality is enforcing against them a rule that is distinct from the constitutionally valid enactment." *Id.* "It should be underscored, however, that '[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

Plaintiffs allege that they "are two of the more outspoken protesters at the ICE building, and appear to have been targeted by DHS because of the speech and because of their appearance of being leaders of the weekly protests." ECF No. 8 at 8. They admit, however, that they were each cited with, or warned about, the noise ordinance when they were using megaphones. ECF No. 1 at ¶¶ 28–30. In addition, FPS reports show that the time that each Plaintiff was cited or warned, FPS received complaints from those working in the building that the volume of the protest was interfering with their normal job duties. Exh. A at 4; Exh. C at 4–6. On other days, protestors, including Plaintiffs, were permitted to proceed. By Plaintiffs' own allegations, they have been engaging in protest activity at this site weekly, or more often, "for months" with only the two reported incidents of citation or warning. ECF No. at ¶ 1, ¶¶ 28–30. Thus, even assuming Plaintiffs' allegations to be true, they fail to carry the burden to show that they are likely to succeed on this claim. *Winter*, 555 U.S. at 24; *cf. Fla. Carpenters Reg'l Council v. City of Miami Beach*, No. 09-22329-CIV, 2009 WL 10699575, at *8 (S.D. Fla. Dec. 4, 2009) (rejecting arbitrary enforcement claim to noise ordinance). Nor do Plaintiffs allege that others promoting alternative

viewpoints and causing a similar level of noise or disturbance are not being prosecuted; for example, there is no allegation that individuals shouting support or encouragement for DHS policies are not being similarly warned or apprehended when their speech reaches the same volume. At the very least, the government has introduced sufficient evidence through the attached incident reports to create a factual dispute that precludes awarding Plaintiffs' extraordinary preliminary relief at this time.

### C.    The Regulation Is Not Contrary to Law Under The APA

Plaintiffs allege in their complaint that the Protection of Federal Property regulation violates the APA as contrary to law. ECF No. 1 at ¶¶ 38-46. But Plaintiffs fail to make this argument in their motion for a temporary restraining order. Plaintiffs have therefore waived this argument. *See, e.g.*, *Tamir v. Virgin Atl. Airlines*, 205 F. App'x 607, 608 (9th Cir. 2006) (a moving party "waive[s] any issue … by failing to make any legal arguments in his opening brief"). But even on the merits, this fails.

First, the Property Clause of the U.S. Constitution affirmatively grants "Congress … Power to dispose of and make all needful Rules and Regulations respecting … Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. As the Ninth Circuit has explained, "[i]t is well established that this clause grants to the United States power to regulate conduct on nonfederal land when reasonably necessary to protect adjacent federal property[.]" *United States v. Lindsey*, 595 F.2d 5, 6 (9th Cir. 1979). Exercising this authority, Congress has statutorily authorized the government to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government[,]" 40 U.S.C. § 1315(a), as well as "areas outside the property to the extent necessary to protect the property and persons on the property." *Id.* § 1315(b)(1); *see also id.* § 1315(e) (providing additional authorities to enforce Federal, state, and local laws "outside

Federal property"). The Secretary, in turn, is authorized to "prescribe regulations necessary for the protection and administration of property owned or occupied by the Federal Government and persons on the property." *Id.* § 1315(c)(1). Plaintiffs do not even argue that the regulation at issue exceeds DHS's statutory authority. Furthermore, in practice, courts have commonly found that FPS officers have "reasonably exercised their investigative and protective authority pursuant to § 1315 when they le[ave] federal property" to investigate or make arrests. *United States v. Evans*, 581 F.3d 333, 335 (6th Cir. 2009). To the extent there is any argument that the statute is contrary to law or contrary to a constitutional right, these arguments are coextensive with the Plaintiffs' Fifth Amendment vagueness and First Amendment free speech claims. Because the regulation at issue comports with these provisions of the Constitution, it is also not contrary to law or in violation of a constitutional right under the APA.

## II.    PLAINTIFFS CANNOT SHOW IRREPARABLE HARM OR THAT THE PUBLIC INTEREST OR BALANCE OF THE EQUITIES WEIGH IN THEIR FAVOR

The Court can, and should, deny the motion for preliminary injunction based on Plaintiffs' inability to show likelihood of success on the merits. But the other *Winter* factors also support denial.

### A.    Irreparable Harm

Plaintiffs continued to engage in protests around the Eugene Federal Building after their citations. Although they opine that "other, less outspoken" people may be dissuaded from protesting, they have made no such showing. ECF No. 8 at 16. After Plaintiff Longworth was arrested and cited under the regulation on November 18, she returned, along with Plaintiff Lardner and 60 other community members, to protest the following week, and again the week after that. Exh. C at 4.

B.    Balance of the Equities and Public Interest

When a party seeks a preliminary injunction against the government, the balance of the equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 425 (2009). The public has an interest in the orderly operation of federal services. The Plaintiffs' use of megaphones in their protest activities has proven disruptive to other public services conducted within the Eugene federal building, notably the IRS's customer service operations. The noise regulation, like other ordinances of its kind, serves to balance the right to engage in political speech with the need to allow continued functioning of government services.

Recent events further underscore the urgency of protecting Federal property in Eugene, Oregon and policing the area outside the Federal building there. On January 30, 2026, "Eugene police declared a riot *outside of the Federal Building*." *Eugene police chief feared violent clash between feds, protestors*, USA Today (Jan. 31, 2026)[2] (emphasis added). The riot declaration came "when a small group of protestors broke a window and began entering the Federal Building." *Id.* "A handful of civilian workers were inside the building when protesters breached the facility," including "[f]our or five Federal Protective Service officers." *Id.* The Eugene police chief explained his decision was based on in part on his worries over "how those employees and officers might react if they felt overwhelmed." *Id.* In his words, "They're just trying to do their job and they're in that building and they're seeing people trying to break in. There's a level of fear there." *Id.* This underscores the public interest in allowing FPS officers to exercise their full regulatory authorities in and around the Federal Building in Eugene. For these additional reasons, the Court should deny the motion for a preliminary injunction.

---

[2] https://www.usatoday.com/story/news/local/2026/01/31/chief-skinner-on-why-epd-declared-riot-jan-30/88452700007/

## III.    ANY INJUNCTIVE RELIEF SHOULD BE TAILORED TO PLAINTIFFS

Finally, the Court's ex parte order is overbroad.  As the Supreme Court has recently clarified, any relief must be narrowly tailored to Plaintiffs who have met their burden of establishing irreparable harm.  *See Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025) (an "injunction … extends only to the suing plaintiffs"); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (explaining that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs").  Yet the Court's temporary restraining order enjoins "Defendants to refrain from enforcing the 'loud or unusual noise' provision of 6 CFR § 139.35(c) on the sidewalks surrounding the federal building located between 6th and 7th Avenues and Pearl and High Streets in Eugene, Oregon."  ECF No. 14 at 10.  By its terms, it is not limited to Plaintiffs who are parties to this case and have standing.  It is therefore, to that extent, overbroad.

Should the Court be inclined to grant further injunctive relief, it should be narrowly tailored to Plaintiffs who have met their burden of establishing irreparable harm. Significantly, Plaintiffs are differently situated from generic members of the public or even other protestors.  As the record in this posture shows, Plaintiffs have been arrested for violating this regulation.  Any injunctive relief should be limited to the parties.

Should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post security.  Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  In the event the Court issues a preliminary injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any such order.

## CONCLUSION

For these reasons, the Court should DENY Plaintiffs' Motion for a Preliminary Injunction.

Respectfully submitted on this 4th day of February, 2026.

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

*/s/ Michael Velchik*
MICHAEL VELCHIK
Senior Counsel to the Assistant
Attorney General

SCOTT E. BRADFORD
United States Attorney
District of Oregon

*/s/ Suzanne Miles*
SUZANNE MILES
Assistant United States Attorney

Attorneys for Defendants

26