IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| CHLOE LONGWORTH; ANNA LARDNER | Civ. No. 6:25-cv-2268-AA |
| Plaintiffs, | **OPINION & ORDER** |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity; KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS), in her official capacity; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

AIKEN, District Judge.

This case comes before the Court on a Motion for Preliminary Injunction, ECF No. 8, filed by Plaintiffs Chloe Longworth and Anna Lardner. This Court previously granted the Motion for Temporary Restraining Order ("TRO") on December 10, 2025. ECF No. 14. The TRO was extended 14 days by the Court on December 22, 2025. ECF No. 19. The TRO was further extended by agreement of the parties twice. ECF Nos. 22, 25. Plaintiffs seek to convert that TRO into a preliminary injunction. The Court heard oral arguments on February 20, 2026. For the reasons set forth below, the motion is GRANTED consistent with this opinion.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show (1) that he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in his or her favor; and (4) an injunction is in the public interest. *Id.* at 20.

In the Ninth Circuit, courts may apply an alternative "serious questions" test which allows for a preliminary injunction where a plaintiff shows that "serious questions going to the merits" were raised and the balance of hardships tips sharply in plaintiff's favor, assuming the other two elements of the Winter test are met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). This formulation applies a sliding scale approach where a stronger showing on one element may offset a weaker showing in another element. Id. at 1131. Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion by a "clear showing" of the four elements set forth above. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

## DISCUSSION

Plaintiffs allege that Defendants President Donald Trump, Secretary of the Department of Homeland Security Kristi Noem, and the Department of Homeland Security ("DHS") are unlawfully impinging on and chilling Plaintiffs' free speech

rights in a traditional public forum through the use of vague standards promulgated in newly enacted federal regulations, specifically 6 C.F.R. § 139.35(c), which criminalizes "loud or unusual noise." Plaintiffs allege that Defendants' actions have the effect of chilling their and others' right to free speech by criminalizing constitutionally protected speech in traditional public fora. Plaintiffs move to convert the Court's temporary restraining order into a preliminary injunction.

## I.     Factual Background

### A. The Parties

Plaintiff Chloe Longworth is a resident of Eugene, Oregon and a human rights activist who has regularly engaged in protest activity at the federal building in downtown Eugene. Longworth Decl. ¶ 2, ECF No. 9,

Plaintiff Anna Lardner is human rights activist who has been regularly protesting at the federal building in Eugene, Oregon since approximately July 2025. Lardner Decl. ¶ 2, ECF No. 10.

Defendant Donald Trump is the President of the United States and directs the priorities and policies of the agencies in the executive branch of the federal government. Compl. ¶ 8 President Trump is being sued in his official capacity. *Id.*

Defendant Kristi Noem is Secretary of U.S. Department of Homeland Security ("DHS"), a cabinet level position in the executive branch of the federal government. Compl. ¶ 9. In that position, she oversees and directs various sub-agencies and departments, including Immigration and Customs Enforcement ("ICE"), U.S.

Customs and Border Protection ("CBP"), and Federal Protective Services ("FPS"). *Id.* Secretary Noem is sued in her official capacity. *Id.*

Defendant U.S. Department of Homeland Security is a cabinet level department of the executive branch of the federal government. Compl. ¶ 10. DHS is responsible for the protection of many federal facilities, including the Eugene Federal Building located between 6th and 7th avenues and High Street and Pearl Streets in downtown Eugene, Oregon (the "Federal Building").

### B. The Federal Regulations

In June 2025, DHS finalized new rules regarding the protection of federal property. Protection of Federal Property, 90 Fed. Reg 24217-01. The new rules were scheduled to go into effect January 1, 2026, but on November 5, 2025, the federal government accelerated the effective date of the new regulations to be effective immediately. Protection of Federal Property; Changed Effective Date, 90 FR 49247-01.

The new rules expand the geographic scope of the prior rules to include areas outside federal property. Compl. ¶ 18. Specifically, one of the updated regulations prohibits "[c]reating a loud or unusual noise, noxious odor, or other nuisance" (the "Noise Provision"). 6 C.F.R. § 139.35(c). This applies to "Federal property or in areas outside Federal property that affects, threatens, or endangers Federal property or persons on Federal property." § 139.35.

The regulations contain applicable definitions, but neither "loud" nor "unusual" is defined. § 139.15. Nuisance is defined as "a condition, activity, or

situation, to include a loud noise or foul odor, that interferes with the use or enjoyment of Federal property." *Id.* Put together, a violation of the Noise Provision requires (1) creating a loud or unusual noise (2) in areas on or outside Federal property (3) that affects, threatens or endangers persons on Federal property (4) and interferes with the use or enjoyment of Federal property.

### C. Protest Activity and Enforcement

On November 18, 2025, Longworth was detained, arrested, and issued a citation under the Noise Provision using a megaphone on the city-owned sidewalks outside the Federal Building.   Longworth Decl. ¶ 8. The next day, Longworth returned to site of the protest, and a federal officer, calling her by name, threatened to arrest her for "yelling." *Id.* ¶ 19. The citation issued on November 18, 2025, was dismissed by the U.S. Attorney's office in early December 2025. Compl. ¶ 29.

On November 25, 2025, Lardner was approached by a DHS employee and threatened with arrest under the Noise Provision for speaking through a megaphone on the public sidewalk. *Id.* ¶ 30.

Defendants expand the narrative of these incidents in their Response to Plaintiff's motion. Def. Resp. at 7-8, ECF No. 30.  On November 18, 2025, while Longworth was demonstrating outside the Federal Building with two megaphones, a worker in the Federal Building complained about "the language being used and the volume to which it was amplified." *Id.* at 8 The language included terms such as "fucking nazis," "rapists," and "pedophiles." *Id.* at 8. Due to the language and volume,

the worker "did not feel safe going outside the building to perform his work duties." *Id.*

On November 25, 2025, while Lardner was using a megaphone outside the Federal Building, an Internal Revenue Service ("IRS") employee who works in the Federal Building made a complaint "that the noise . . . was interfering with the agency's routine business operations." *Id.* FPS officers issued warnings to the demonstrators, including Lardner, "but, after those verbal warnings, the noise intensified." *Id.*

That same day, Eugene city police were called about the noise. When the officers spoke to Lardner, they informed her that she was not breaking the law, but "wanted the protesters to be 'aware' that there were people being affected by the noise." Lardner Decl. ¶ 7. No arrests or citations were given by FPS or the Eugene police. Def. Resp. at 13.

## II. Success on the Merits

To prevail on a motion for preliminary injunction, a plaintiff must show either a likelihood of eventual success on the merits or, under the Ninth Circuit's alternative "sliding scale" formulation of the test, serious questions going to the merits of their claims. *Winter*, 555 U.S. at 20; *Alliance for the Wild Rockies*, 632 F.3d at 1131-32. However, a court's decision on a motion for preliminary injunction is not a ruling on the merits of the claim. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

Plaintiffs allege that the Noise Provision was a violation of the Administrative Procedures Act ("APA"). 5 U.S.C. § 551 et seq.; Pl. Mot. at 9. Specifically, Plaintiffs argue that the new regulations are "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law." Pl. Mot. at 9 (citing 5 U.S.C. §§ 706(2)(A)-(D)).

Plaintiffs argue the Noise Provision is unconstitutional, and thus a violation of the APA, because it is (1) void for vagueness under the Due Process of the Fifth Amendment; (2) overbroad under the First Amendment; and/or (3) that it is an invalid time, place manner restriction in violation of the First Amendment. Pl. Mot. *passim;* U.S Const. Amend. I, V.

At this stage, to be granted a preliminary injunction, Plaintiffs must show either a likelihood of eventual success on the merits, or serious questions, regarding at least one theory of unconstitutionality. The Court now looks to the Fifth Amendment Due Process challenge regarding vagueness.

If a law's prohibitions are not clearly defined, (i.e., vague) the law is violative of due process. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A vague law has a chilling effect, as "uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone[.]'" *Id.* at 109. A law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Id.* at 108. The Court also said:

> [I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Id.* at 108-09.

Defendants acknowledge three dangers of vague laws: "'(1) individuals should not be punished for behavior they could not have known was illegal[,] (2) vague laws allow arbitrary and discriminatory enforcement[,] and (3) vague laws may have a chilling effect on free speech.'" Def. Resp. at 10 (alteration in original) (quoting *O'Brien v. Welty*, 818 F.3d 920, 930 (9th Cir. 2016)). The Ninth Circuit has alternatively described the second danger as requiring "adequate guidelines to govern law enforcement." *U.S. v. Brice*, 926 F. 2d 925, 930 (citing *U.S. v. Van Hawkins*, 899 F. 2d 852, 853-54 (9th Cir. 1990).

### A. Notice of Conduct Proscribed

This is not the first court to examine a prohibition on "loud or unusual noise." *See, e.g. United States v. Wasylyshyn*, 979 F.3d 165, 176-77 (2d Cir. 2020) (denying as-applied challenge to regulation on loud or unusual noise within a courthouse).

Courts have upheld ordinances and other rules based on the enforcement context. *See Grayned*, 408 U.S. at 119 (upholding ordinance designed to prevent disruption at public schools); *U.S. v. Agront*, 773 F. 3d 192, 197 (9th Cir. 2014) (listing particular reasons Veterans Affairs facilities need a calm environment in upholding regulation in face of as-applied vagueness challenge.); and *U.S. v. Szabo*, 760 F. 3d 997, 1002 (9th Cir. 2014) ("VA medical facilities are 'non-public' fora…and the

government's power to regulate speech 'is at its greatest when regulating speech in a non-public forum[.]'").

 The court in *Wasylyshyn* emphasized the "enforcement context" as being "dispositive" for a regulation's "survival." 979 F. 3d at 176. In upholding the noise regulation in that case, the court explained that "enforcement of the Noise Regulation is restricted to a narrow and special environment." *Id*. The court concluded that "[r]easonable people can predict with a high degree of accuracy whether their conduct would create a 'loud or unusual noise or a nuisance' in a federal court building." *Id*.

Here, the expanded scope of the challenged regulation has shifted the enforcement context. Under the prior regulations, a similar rule against loud or unusual noise applied only on federal property. The new regulation applies to a sidewalk, which is a traditional public forum, and, as a practical matter, also quite resistant to easily intuited decorum or standards of behavior. While the previous regulation might have been restricted to a narrow and special environment, the updated Noise Provision, with its expanded scope, is clearly less narrow because it is no longer limited to a single environment.

This Court must keep its focus on reality. Appropriate behavior is context specific. The same behavior that might be "loud or unusual" inside a courthouse would be no such thing at a University of Oregon football game held at Autzen Stadium. Reasonable people can tell the difference, and act appropriately. Both "loud" and "unusual" must be placed in context to be understood.

As an illustration, the Court will look at the environs of the Federal Building where Plaintiffs have protested, which was described at oral arguments. 6th and 7th Avenues are both four lane, one-way thoroughfares, the former running west and the latter running east. Both connect to the Ferry Street Bridge just across High Street—an off-ramp leads onto 6th Avenue and 7th Avenue leads to an on-ramp. Across from the Federal building, in each cardinal direction, are parking lots.

That area has been the traditional center of protest activity in the Eugene, as noted by Plaintiffs' counsel in oral arguments. Protesters can avail themselves of high vehicular, pedestrian, and bike traffic, as well as being in the epicenter of government activity—a traditional target of protests. *See Occupy Eugene v. U.S. Gen. Servs. Admin.,* 43 F. Supp. 3d 1143, 1146 (D. Or. 2014) (Occupy Eugene protested at the plaza on the ground of the Federal building "because it has always been a lawful place for demonstrators and picketers to congregate [and] . . . the Plaza is located on a highly-visible, busy street corner [and] is adjacent to courthouses, federal, state, and municipal political offices.") (quotation marks and citations omitted). Of note, in *Occupy Eugene*, the plaza of the Federal Building—which is on the federal property—was held to be a traditional public forum because of its "long history of both protests and other gatherings[.]" *Id.* at 1153.

Defendants argue that the background law of nuisance cabins the regulation: "[T]he regulation cannot be unconstitutionally vague because it is tied to the definition of 'nuisance,' which is well-defined at common law." Def. Resp. at 16. Defendants acknowledge that the regulations specifically define "nuisance" as

anything that "interfere[es] with the use of enjoyment of federal property." Def. Resp. at 16 (quoting 6 C.F.R. § 139.15).

As a basic matter, nuisance" is a contentious area of tort law. The case cited by Defendants for the proposition that common-law terms obviate a vagueness challenge looked at "substantial risk" and "gross deviation." *Panther v. Hames*, 991 F.2d 576, 579 (9th Cir. 1993). Nuisance, standing alone, is too wide and variable a subject— and too context specific—to provide adequate notice to both lay persons and law enforcement in the way that "substantial risk" and "gross deviation" have been held to do. Nuisance is not nearly as objective a term as the other examples of common-law terms that have been held to not be vague.

The Court notes the lack of objective standard in the Noise Provision. That is not to say that a noise regulation needs a scientific standard, such as a decibel level or measurable distance of audibility. But common law nuisance is cabined by common law concepts of objectivity: "reasonableness" and "significant" or "substantial" harm. *See* Restatement (Second) of Torts § 821D (1979) ("[I]ntentional interference with the plaintiff's use or enjoyment is not of itself a tort, and *unreasonableness* of the interference is necessary for liability.") (emphasis added); *see also* § 821F (1979) ("By significant harm is meant harm of importance, involving more than slight inconvenience or petty annoyance. The law does not concern itself with trifles, and therefore there must be a real and appreciable invasion of the plaintiff's interests[.]"). This leads to a question: is there an unstated "reasonableness" and/or "substantial harm" standard that a reasonable person would know to read into the rule?

As a comparison, Defendants cited ORS 166.025(1)(b) in oral arguments as an example of a law regulating noise that was upheld against a vagueness challenge. But that law explicitly uses the term "*unreasonable* noise." ORS 166.025(1)(b) (emphasis added). In *State v. Marker*, the Oregon Court of Appeals collected cases from around the country in analyzing the vagueness challenge to the Oregon law. 21 Or. App. 671, 676-678 (1975) (Alaska: "makes a loud noise" was impermissibly vague; Tennessee: "making any improper noise" was unconstitutionally vague; Florida: "loud or unusual noise" was vague; Connecticut: "making unreasonable noise" was constitutional and not vague; Illinois: the word "unreasonable" is not vague). The variability of interpretation underscores the contentious nature of nuisance case law and the objective analysis.

These issues are heightened when fundamental rights are implicated. In *Marker*, the Oregon Court of Appeals also held that proper construction of "noise" meant that "[w]hen speech is involved it can be classified prohibited noise only if there is a clear and present danger of violence or if the communication is not constitutionally protected speech but merely a guise to disturb persons." 21 Or. App at 679 (1979). The Oregon Court of Appeals has since distinguished *Marker*, as illustrated in a case cited by Defendants: *State v. Pucket*, 291 Or. App. 771 (2018). In *Pucket*, the court explained that *Marker*'s reasoning would only apply today if the content of the speech was at issue. In *Pucket*, the content problem was addressed squarely by the facts, as discussed further below.

In the line of federal cases cited by Defendants, the objective standard seems to have been the "narrow and special environment"—e.g., a school in *Grayned* and a courthouse in *Wasylyshyn*.   The particularity of the environment—standards of behavior that are easily intuited with a high degree of accuracy—was what put reasonable people on notice. But that is only half the picture in the enforcement context, as discussed in the next section.

Here, the Noise Provision applies to two environments: federal properties of various characters across the nation, and areas adjacent to those federal properties, which include sidewalks, the quintessential traditional public forum. As a threshold matter, different government facilities will have different environments: some narrow and special, like a V.A. hospital or a courthouse, but others, like the Eugene Federal Building, house a host of different agencies and services and also include traditional public forums by long standing tradition.

Additionally, while all public sidewalks are traditional public forums, not all sidewalks set the same intuited standards of behavior. A reasonable person would distinguish between a sidewalk in a residential neighborhood and a sidewalk in a downtown area. And the Court doubts that a reasonable person would think a downtown sidewalk should be *quieter* than a sidewalk in residential neighborhood.

While not a hard and fast rule, the lack of an objective standard in the Noise Provision weighs in favor of vagueness. And that must be coupled with the enforcement context—now including high-traffic public sidewalks abutting four lane

roads—which does not lend itself to readily deducible inferences with a "high degree of accuracy" about what is and is not expected behavior.

B. **Danger of Arbitrary or Discriminatory Enforcement**

The lack of an objective standard in the Noise Provision creates a risk of arbitrary or discriminatory enforcement. Defendants rely on the existence of complaints for the enforcement of the Noise Provision, but do not assess the reasonableness of those complaints or the level of interference.

For example, in the November 18, 2025, incident involving Longworth, the complaint focused on the content of the message as much if not more than the volume. Def. Resp. Ex. A at 6. (complainant had "feeling of being really scared of interacting with the protesters, not wanting to be attacked verbally, cursed at, or called names."). With respect to volume, the incident report and narrative by FPS comments on "increased loudness" and the "megaphone." There is no analysis of the volume itself, such as where it was audible from. There is no objective analysis of reasonableness of the noise, the interference, or of the complaint. The enforcement was based on the subjective experience of one employee, and even then, the employee was reacting to the content of the speech as much as, if not more than, to the volume or unusualness of the noise.

As another example of discriminatory or arbitrary enforcement, an officer threatened Longworth with arrest for "yelling." This was in a public forum, surrounded by downtown traffic, and near an off-ramp and overpass. Objectively,

yelling does not seem either "loud" or "unusual" in the context. But the enforcing officer was seemingly empowered by the lack of standards to threaten enforcement.

The incident involving the IRS employees and Lardner is the most complex, as it involved multiple complaints, as well as Eugene Police Department ("EPD") officers in addition to federal officers. As a preliminary matter, there is a dispute of fact. Plaintiffs claim the EPD officers told them, effectively, that no crime had been or was being committed. Pl. Mot. at 7.; Lardner Decl. ¶ 7.  In the FPS incident report, the FPS officer relates that another officer informed her that "EPD issued verbal warnings." Def. Resp. Ex. C at 5.  The Court cannot definitively resolve this dispute but finds Lardner's version more credible. Her version is based on her own first-hand experience of hearing the EPD officers. The FPS officer's understanding is, at best, second-hand.

The first complaint from the November 25, 2025 incident was made by the IRS manager at the Federal Building. He said that "routine business operations were being disrupted." Def. Resp. Ex. C at 4. The FPS officer explains that the "megaphones were being used on the sidewalk off federal property[,]" but also that some "protesters" in the east courtyard "used megaphones directly against the building's glass." *Id.* One officer, when asked by a protester what amounted to a "loud or unusual noise," responded that "the use of a megaphone or any similar devise *could* be considered prohibited conduct." *Id.* (emphasis added).

 On the record before the Court, we cannot know what use of a megaphone would and would not amount to a violation. What the Court can tell is that use of a

megaphone is not a *per se* violation in the eyes (or ears) of that enforcing officer. It follows that megaphone use must be allowed under some circumstances, but the Court cannot discern what standard the government would apply in making that determination. More likely, the standard would vary based on the officer, the complainant, and, possibly and certainly impermissibly, the identity of the speaker.

The Court now returns to an issue raised in the previous section. In addition to and complementary of an objective standard—even a flexible one—one should expect objective evidence, such as found in *Agront.* 773 F.3d. at 195. *Agront* was an as-applied challenge in which the defendant did not make any First Amendment claims. *Id.* The court in *Agront*, in finding that the conduct at issue fell within the federal regulation as applied, the court noted that the noise was heard "inside the hospital lobby 25 yards away and from inside a running police car with the windows up and doors closed 15 yards away." *Id.* at 197. In *Wasylyshyn*, the defendant was heard by a court security officer from "40 to 45 feet away." 797 F.3d. at 170.  In the Oregon case cited by Defendants, the record included an officer who made "audio recordings from three positions located across Highway 101 from Fred Meyer and approximately 300 feet from defendant[.]" *Pucket*, 291 Or. App. at 773. All of this speaks to the reasonableness of the volume in objective terms.  In *Grayned*, the facts showed a substantial interference:

> "[H]undreds of students were distracted from their school activities and lined the classroom windows to watch the demonstration; [ ] some demonstrators successfully yelled to their friends to leave the school building and join the demonstration; [and] uncontrolled latenesses after period changes in the school were far greater than usual, with late students admitting that they had been watching the demonstration[.]"

408 U.S. at 105.

Here, the closest thing in the record to a measurement of volume is in the statement by one of the IRS employees who works on the ground floor of the Federal Building: "The proximity of where I sit – 8 feet from the window – to the sidewalk they are walking on—High Street[.]" Def. Resp. Ex. C at 10. Defendants have provided reports from four employees, as well as two probable cause narratives from security personnel, but the only truly objective fact they muster regarding the loudness of the noise at issue is unclear but seems to be of a relatively short distance.

In terms of interference, those same reports provided by Defendants are individuals' subjective experiences, and even those are written in very general terms. For example, One IRS employee says protesters "are disruptively noisy[,]" "extremely disruptive to business with taxpayers[,]" and that "the ruckus" is "certainly captured" on audio recordings the employees make of their interactions. Def. Resp. Ex. C at 9. Another IRS employee says the noise "makes it very difficult to hold conversations. . . and concentrate on my work." *Id.* at 10. The IRS manager says that protesters are "disrupt[ing] normal functioning of the building" and that "routine business in interrupted[.]"

The Court notes that the most objective impact of the protests is the noise being picked up on sound recordings made in an office on the ground floor with a window close to the sidewalk. But the Court is not convinced that a reasonable person protesting on a sidewalk next to a government building is on notice that recordings are taking place and should know to act accordingly. Compare this to *Agront*, which

discusses the need for a quiet and calm environment in a VA hospital. That is something a reasonable person could intuit. That noise from a sidewalk would interfere with IRS audio recordings is not something of which a reasonable person would be aware.

The Court would be remiss if it passed over another feature of the FPS officer's report. In the report on the November 25, 2025, incident, the officer says, "This is also a violation of Oregon Revised Statues 166.025 Disorderly conduct in the second degree, paragraph (b) Makes unreasonable noise."

The Court does not know why the officer chose to opine on the legality of the activity under Oregon law. But this Court is doubtful that the officer correctly analyzed the standard. ORS 166.025 includes an objective standard—reasonableness—yet the officer did not engage in any objective analysis or present facts to support it. A comparison to the Oregon case cited by Defendants on this same law is illustrative.

As stated above, in *Pucket*, which, like the instant case, involved the use of a megaphone on a sidewalk, an officer made audio recordings from 300 feet away and across a highway, and a witness testified to hearing the defendant from 50 feet away inside a parked car. 291 Or. App. at 773.  This speaks directly, and objectively, to the volume of the noise, and hence its unreasonableness. Another witness said she could hear the noise for the "better part" of her eight-hour shift at a hotel across the highway from defendant. *Id.* This speaks directly and objectively to the duration of the noise and, again, supports unreasonableness. Most importantly, only two

witnesses testified that they could understand the content of defendant's speech, and those were both from a short distance away. *Id*. This fact is important because it shows that the content of the speech was not at issue, just the volume and duration. And finally, the officer in *Pucket* noted that the megaphone was turned to its maximum volume. *Id*.

As stated earlier, Defendants' exhibits—the four employee complaints and the two probable cause narratives—offer only one objective fact about the loudness: that it was audible by an IRS employee on the ground floor who sat eight feet from the window. The FPS officers themselves made little attempt to document the volume or unusualness of the noise in an objective or measurable way. While the report on the incident with Lardner does not mention the content of the speech, it also does not rule out the content of the speech, as is specifically done in *Pucket*. And of course, in the complaint that resulted in the citation of Longworth, the content was a central part of the complaint. That is evidence that the Noise Provision is susceptible to arbitrary enforcement and that the rule does not provide adequate guidelines to govern law enforcement.

To this Court, the Noise Provision has shown itself to be enforceable on an "ad hoc and subjective basis" because it has no "explicit standards," just as *Grayned* warned was possible. This tends to show the law is impermissibly vague.

### C. Chilling Effect

The third danger of a vague law in the context of speech is the chilling effect. In analyzing a chilling effect, courts must ask whether a law would "chill or silence a

person of ordinary firmness from future First Amendment activities." *Mendocino Env't Ctr. v. Mendocino Cnty.,* 192 F.3d 1283, 1300 (9th Cir. 1999). The Court notes that this test involves an objective standard—a person of "ordinary" firmness.

Here, there is ample evidence that the enforcement and threatened enforcement chilled speech on topics of public concern in a traditional public forum. Lardner states that "[m]any fellow protestors and volunteers are afraid they will be wrongfully targeted by DHS and/or arrested or threatened with arrest." Lardner Decl. ¶ 9. She goes on to give an example: one day in November, she "observed a crowd of protesters standing across the street" from the Federal Building. *Id.* When Lardner asked why, one protester said, effectively, "they believed they were no longer allowed on the other side of the street to protest without being threatened with arrest." *Id.*

Another declarant, Latiffe Amado Horton, who was once a regular protester at the Federal Building, states that

> "Many fellow volunteers are afraid they will be wrongfully targeted by DHS and/or arrested or threatened with arrest. As a result, many folks now stand across the street or have stopped attending events at the federal building, including myself."

Horton Decl. ¶ 6, ECF No. 11.

Longworth's declaration corroborates a similar chilling of protest activity. Specifically, she says that

> "[On] the day of my arrest, as I was leaving the federal building block to go off-site, I saw (for the first time) a group of about 20 or 30 protesters standing across the street from where the back gate is (on the west side of Pearl St. next to 6th Avenue). Those protesters had previously held their protests on the sidewalk next to the ICE building.

Longworth Decl. ¶ 15.

Page 20 – OPINION AND ORDER

The group is described as a "crowd" by Horton and as involving 20 to 30 protesters by Longworth, which militates in favor of finding that objective standard—"a person of ordinary firmness"—has been met. This was not a change in behavior by one, two, or a handful of people. Rather, a large group changed behavior to avoid legal repercussions for what appears to be, on this record, regular, protected First Amendment activity.

Plaintiffs have shown that the Noise Provision is unclear on what it prohibits, that it gives inadequate guidance to law enforcement and has been enforced or threatened to be enforced in an arbitrary or discriminatory manner, and that it has likely chilled the protected speech of a large group of protesters.

The Court finds that the Plaintiffs have shown a likelihood of success on the merits of their APA claim under a vagueness theory of unconstitutionality. Having determined the vagueness theory suffices to show a likelihood of success on the merits, the Court has no need to reach the overbreadth and time, place, manner challenges at this time.

### III.    Irreparable Harm

A plaintiff seeking an injunction must "must establish that irreparable harm is *likely*, not just possible." *Alliance for the Wild Rockies*, 632 F.3d at 1131 (emphasis in original).

The Ninth Circuit has repeatedly held that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).

Here, there is evidence that the Noise Provision and its enforcement and threatened enforcement has chilled the speech of protestors around the Federal Building. The record shows that the chilling, and thus the irreparable harm, is well beyond "possible," at least "likely," and, more probably, extant.

The Court concludes that this factor weighs in favor of Plaintiffs.

## IV.    Balance of the Equities and the Public Interest

Under the "balance of equities" analysis, a court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks and citation omitted).  The public interest inquiry, by contrast, "primarily addresses impact on non-parties rather than parties."  *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).  When, as here, the government is a party to the action, these factors will merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Here, Plaintiffs have made a compelling showing that Noise Provision fails to give adequate notice of what it prohibits, is susceptible to arbitrary and discriminatory enforcement, and has the effect of chilling speech. Upholding free speech—a fundamental right—is of "significant public interest." *Klein*, 584 F.3d at 1208.

Additionally, as discussed below, the Court is not enjoining enforcement of the Noise Provision except on the public sidewalks abutting one specific federal property. This injunction is not nationwide, nor district-wide, or even city-wide. Further still,

the injunction is not even *facility wide*—even though the property itself contains a traditional public forum. The preliminary injunction is limited to the enforcement of the Noise Provision on particular public sidewalks.

The Court also notes that the area surrounding the Federal Building is, as discussed, largely comprised of busy streets and parking lots. The absence of residential buildings and the small number of nearby businesses minimizes the possibility of annoyance to the surrounding community from loud or unusual noises.

Any harm or annoyance suffered by the members of the public, or by Defendants' employees, because of the protests is more than offset by the necessity of protecting the exercise of fundamental rights in a traditional public forum.

The Court concludes that the balance of the equities and the public interest weigh in favor of the preliminary injunction.

## V.    Bond

The Court "may issue a preliminary injunction only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Here, the Court concludes that the facts of this case do not support the necessity of a bond.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction, ECF No. 8 is GRANTED. The Court hereby issues a preliminary injunction ORDERING the Department of Homeland Security acting by and through Secretary Kristi Noem and President Donald Trump to refrain from enforcing the "loud or

unusual noise" provision of 6 C.F.R. § 139.35(c) on the sidewalks surrounding the Eugene Federal Building located between 6th and 7th Avenues and Pearl and High Streets in Eugene.

It is so ORDERED and DATED this ___2nd_____ day of March 2026

_/s/Ann Aiken_____
ANN AIKEN
United States District Judge